and there's no time split on this. How are you splitting your time? Good morning Your Honor. So I'm again taking 12 minutes and Ms. Moran will be taking eight minutes. So the same division as the previous. And again I'd like to have that on the clock, although it doesn't seem to help a lot, but it helps me a little. Okay, go ahead. Thank you Your Honor. So this case is about BLM's efforts to conserve sage-grouse habitat through the adoption of the sage-grouse amendments in 2015, and in particular the adoption of the prioritization objective. The Bureau has adopted guidance to implement that prioritization objective in successive administrations in 2016 and 2018. And the district court here held that BLM's 2018 guidance did not comport with its own resource management plan on this issue, meaning that the Bureau violated FLIPMA in adopting that guidance. And I should say the new administration is now actively reviewing that guidance to determine whether it complies with current policy. But the district court here... Is there any timeline on that? I do not have a timeline for you, Your Honor, but... Because, I mean, this has been happening a lot. The cases start changing posture. Sure, I don't know if there's any action on that front if there is. It could very well be soon, but I just don't have a timeline for you, Your Honor, on that issue. So I find this case... First of all, we have the same injunction issue. We may have beaten that to the ground sufficiently. So unless somebody is dying to argue about it, I think maybe no more needs to be said. Unless it's different in some way. Is it different in any way? I think to the extent that district courts use, you know, different wording, there are some slight differences, but the general issue is the same. Well, one difference, of course, is precisely because we still do have the overall issue here of the validity of the the basic decision, the IM, that hasn't gone away. So as to the injunction question, the issue of whether that vacating that as an injunction is still before us, and it's not in the other case. In the other case, all we have are the individual lease sales. So in the federal government's appeal, in this case, we are not appealing the decision to set aside the guidance document. Our appeal is solely focused on the leasing decision. So in that sense, the government's appeal is similarly situated to the other case. By counsel, am I correct that the sale at issue here is a subset of the sales that are issued in the other case? Correct. Yes. Okay. You mean you're some of the same sales? There's just one sale at issue in this case. It is the second quarter Wyoming sale from June 2018. It is one of the five sales that is at issue in the other case. But it's a big chunk of it. I mean, from a monetary point of view, it's about a third of what was involved in all five sales was my understanding. That's correct, your honor. This sale is about what the mathematicians would call a proper subset of the previous one. That's correct. The two Wyoming sales in the other case. When you say you're not appealing, I know you said you're not appealing this, but I thought your brief did, in some length, try to defend the notion that prioritization occurred here. That's correct, your honor, with respect to the lease sales themselves. So we're not challenging the district court's decision to set aside the 2018 guidance. But you're relying on the same thing. You're saying prioritization occurred because we applied the backlog rule. So I think what we've done here is more than just simply apply the backlog rule for this June 2018 Wyoming sale. So the government isn't defending the decision to adopt that in that IM. But the government can implement prioritization in a number of ways. The prioritization objective, as articulated in the 2015 plans, which is where these were adopted, is very broadly worded. And then it is implemented through a particular resource management plan that RMP also adopts very broad wording for the prioritization objective. So the government has a number of different tools it can use to implement prioritization. One is this idea of sequencing, which is what the 2018 IM particularly addresses. And it's something that is the focus also of the previous IM, the 2016 IM. So the idea there being that when you have nominated parcels for sale of different types, you should start with the parcels that are not in sage grass habitat management areas, which is a technical term for how the Bureau is managing these areas. In this instance, did the agency offer for sale any leases that were not in the sage grass area? No, Your Honor. So the agency basically works off of what's called expressions of interest. I know that, but I don't understand that, actually. I mean, is there any requirement that they have to offer for sale anything in which there's an expression of interest? So these are informal expressions of interest, and as a practical matter, that is how the Bureau operates. An expression of interest comes in and they nominate a parcel. But the prioritization has to contemplate that the agency has some control over what it's offering. Because it has to prioritize offering ones that are outside the habitats over ones that are inside the habitat. So, Your Honor, I think, so first of all, there are ways to implement prioritization, but beyond deciding which parcels to offer, for example, by applying stipulations to parcels to make them less attractive for leasing and guide development elsewhere. You know, if there's stipulations on a lease that say... I thought that's a different control mechanism, but it's not the one that we're talking about here. So, it is separate from sequencing, but the government's view here is that stipulations can be used to implement the prioritization objective. You know, again, the prioritization objective basically broadly talks about encouraging development elsewhere outside of sage-grouse habitat. Yes, that's right. It's encouraging it elsewhere. So how does putting stipulations on ones that are in the area encourage it elsewhere? So, for example, if a parcel is in sage-grouse habitat, and if it is close to what's called a lek, which is where the sage-grouse engage in sort of... It's masculinity. It's a sort of mating location. So, there are stipulations that the Bureau will attach to any parcel that is nominated for a lease there that says, you know, you can't have surface occupancy, which means you can't put a well within 0.6 miles of a lek, things like that. So, when there are those restrictions on the use of a parcel that might be leased, you know, those parcels are less likely to be nominated. It's less attractive for a third party that wants to... The requirement to have those stipulations is a separate requirement from the prioritization requirement, right? So, I'm not sure what the distinction necessarily is in terms of looking at whether the Bureau is fulfilling its obligation to prioritize development outside of... I have another question. If you're not defending the suspension or the vacating of the 2018 prioritization IM, then aren't we back to the 2016 just like in the other case? If you have an IM and then you have one that replaces it and you vacate the one that replaced it, why aren't you back to the other one? So, I think that issue isn't really presented in this case. Of course it's presented. It's a question of what does vacating it mean? And you're saying you're not appealing to vacating of it. So, if it's vacated, what do we have left? We have left the 2016 one. So, I think our view on this issue is when you vacate a guidance document, it's not like a regulation where, you know, there are some cases saying that the previous regulation snaps back into place. Guidance is essentially just a discretionary document. It's instructions to field offices about how to run leasing decisions and things like that. So, when the 2018 leasing decision or, excuse me, guidance is set aside, then the Bureau essentially is back to a place where it has discretion to figure out how to implement the prioritization. That's not what the judge thought in the other case. The judge thought quite specifically that the 2016 one was gone. We're back to the 2010 one, right? The court issued an order to that effect in the other case. And we don't have an order like that in this case, which is what I was suggesting when I'm saying it's not before the court in terms of deciding what the applicable prioritization going forward would be. Because that sort of order hasn't issued in this case. All that we're appealing is just the determination whether this particular leasing decision should have been set aside as violating FLIPMA. And it wasn't proper for the court to issue that kind of order because this particular leasing decision, the Bureau, you know, used stipulation. In making that determination, you're right that we just have nothing. We have a vacuum. But we still have the prioritization part of the plan. And your view is that the agency can continue with the expressions of interest scheme such that if the only expressions of interest that come in are for the habitat, that's the end of it. They just work on those. In future sales, Your Honor? Yes. So I think, you know, the Bureau would have to figure out in each case exactly how to apply the prioritization. But you say it did that. But it did for the last minute. You're saying that even though that's what it did, it did do prioritization. But that is what it did. For this lease sale, Your Honor? Yes, right. That's what it did. It didn't say, you know, we're only going to put up for sale at least half of the expressions of interest are outside the area. We're not going to sell more than X number within the area. It didn't say that. Right. It didn't make that kind of determination. And to the extent that we can. No determination. It just sat there and waited for people to come in. So how is that prioritization? I think, you know, if you look at the 2016 IM, which is the previous administration's guidance on this issue, which is sort of being upheld as a model of how this could work. It works the exact same way. It just says when expressions of interest come in, you have to sequence them in this order. And you have to consider. And also, as a practical matter, what they were doing was, quote, deferring them, which is meaning not selling them. They were not selling ones within the area. So the Bureau certainly can use deferral, parcel deferral to implement prioritization. The district court, you know, seemed to suggest that was required and then walked back from that. But I think to the extent the court thinks that more needed to be done on prioritization here. Well, tell me what it did. What did it do? It gets 150 of these expressions of interest. They're all within. I know you're figuring about one of them, but let's say they're all within the area. That's that's not supposed to be prioritized. They do nothing to try to get to offer anything for sale outside the area. And they simply go forward with the ones that were the ones that have expressed interest within the area. Period. That's what they do. So how is and the only thing you've told me so far is they can make it less attractive by putting these conditions on. The conditions are a separate part of the flip phone. The plan, as I understand it, they're not this part of the plan. So, Your Honor, I would if I can just point to part of the record in the 2016 I.M., which, again, is what the district court and plaintiffs seem to think is a proper implementation. 2016 I.M. says this guidance is not intended to direct BLM to wait for all lands outside habitat areas to be leased or developed before allowing leasing within habitat. And the model I just gave you doesn't do either of those things. It just says it just takes some control over what's being offered for sale and offers and refuses to offer for sale anything, anybody and just all the ones that everybody asked for was in the area. Not any of them, all of them. So I think, Your Honor, I don't think that was ever required under the 2016 I.M. And to the extent the court thinks that more needs to be done, I just would like to take a second to address the proper remedy here, which was touched on in the last argument, which is I think the heart of what our appeal is here is that we think if the court thinks that more needs to be done to prioritize leasing outside of habitat areas, the proper remedy is remand without vacater. And I know this was discussed. Oh, this seems like a much harder argument in this case. In the other case, what you had is a procedural problem as to what the ones that were actually offered. And it can be fixed by having the participation. But in this one, the problem is what was offered. Yes, Your Honor. And I think the reason that we think that remand is an appropriate way to deal with that is because regardless of the conception of a prioritization and what the government should have done here, I think it's hard to envision a situation where none of these leases could have issued. And if that's the case, because these are, you know, private. Counselor, let me break in at this point, because try to decide what prioritization means if at least some of the questions Judge Berzon is asking would seem to go to the question of what's the alternative. If you offer thousands of leases that nobody wants and have no oil and gas, then you would easily be able to never get to your leases if that's what you have to do to prioritize. So is there something in the regs or anything that says what's the universe? The analogy I give is I asked Bill Gates, well, what are your priorities? And he says, well, you know, I'd like a yacht, I'd like a plane, I'd like to buy the state of Idaho. If he only has a certain amount of money, you can prioritize. But if he can do it all, is that priority or not? So here, what's the option to lease anything that nobody wants? Does the government consider that as part of the issue or not? So I think that explains why the Bureau relies on expressions of interest. If parties aren't interested in parcels that have, you know, no interest outside of habitat area, then there is, you know, limited utility in offering those for lease, because there won't be any bids on it. There's utility, which is it creates a backlog where you work through those first. It keeps you from getting to leasing anything else. I have two questions related to that. So how is it prioritization when all the parcels sold are in safe grouse habitat? So I think to the extent the prioritization is implemented as a question of sequencing, what the Bureau has said in 2016 and in 2018 is that you start with expressions of interest in parcels that are not in habitat areas. And in this case, there just weren't any. So there was no way to implement that kind of sequencing as a means of fulfilling the prioritization objective, which is why we've pointed to some of these other means of also encouraging development elsewhere. Well, one thing that you're pointing to is the 2016 IM. And I'm not sure why you're pointing to that. The question is not compliance with the 2016 IM, but consistency with the 2015 plans, isn't it? Yes, Your Honor. I use that as an example, primarily because I think that's what plaintiffs in the district court think is a proper way of implementing prioritization. The objectives in the RMP, I mean, it is a very broadly worded language. Priority will be given to leasing and development of fluid mineral resources outside of priority habitat management areas and general habitat management areas. When analyzing leasing and authorizing development of fluid mineral resources, priority will be given to development in non-habitat areas first and then in the least suitable habitat. So that leaves the Bureau with a great deal of discretion. In terms of figuring out what that means, it's a complicated issue. Seems like, I mean, either it means nothing, which is possible, or it means something, which you haven't told us what it is yet. In any event, your time is up. Thank you. We'll give you a minute in rebuttal. And we have Ms. Moran. No, we don't have Ms. Yes, we have Ms. Moran. Go ahead. Thank you, Your Honor. May it please the court. My name is Melinda Moran, and I represent Defendant Intervenor Appellant Western Energy Alliance. The alliance represents independent oil and gas producers, the majority of which are small businesses with just 14 employees. And I'd actually like to jump right to the point of whether this was a substantive or a procedural error. And I think the district court's first error was assuming that there was this substantive mandatory requirement to prioritize. And I think this exacerbated the district court's error in applying the Allied Signal Test and getting to that remedy. As explained in the federal defendant's opening brief at pages 33 and 34. So what do you think? Let's wash out the 2016 guidance and the 2018 guidance. What did the 2015 prioritization by itself mean? Great question, Your Honor, and I was going right there. So if you look at section 2.2 of the land use plan, and that's Alliance 2ER 47 through 48, the land use plan uses three categories. Goals, of which there is one. Objectives, of which prioritization is one of 17. And then below that come the more substantive and what the BLM calls management decisions. And looking at the prioritization objective in the level one up within this three-tiered that prioritization objective. There was no... I know, and that's not what I asked you. I don't know. And some core focus, one sentence, what could this have meant? It was a objective that the core management decisions would further the objective of prioritizing leasing and development outside of habitat. So if we look at these management decisions, for example, there's one on federal defendants 4ER 540 that prevents surface disturbing activities in greater sage-grouse winter concentration areas from December 1st to March 14th. That's non-discretionary. It was incorporated as a lease stipulation as well. So if you look at the list of stipulations, BLM was required to apply to any parcel that fell within this winter concentration area. This stipulation preventing surface disturbance for three and a half months. There's zero discretion there. Now, if we contrast that with the prioritization objective, BLM there left itself enormous discretion on how to comply with that. So you're not going to tell me anything about what this means? Well, I don't think it's my position to tell what BLM meant by this prioritization objective, but it was. Well, you have to do that if you're going to tell me it was meant. Well, I believe that BLM could have meant that in numerous ways. The court here erred by finding that the only way to do it was to defer some amorphous number of parcels from this lease sale to a subsequent lease sale, be that lease sale happening in June or September, pardon me, in September or December or January of the following year. So I think there is the error in assuming that there was a substantive requirement. Now, as the federal defense. Basically, you began with this notion about whether it's procedural or substantive, and says the purpose of it is to further limit or limit further surface disturbance and encourage new development in areas that would not conflict with GRSG. And he said, the district court said, well, you're not encouraging anything by only dealing with the backlog. So you have to do something in order to prioritize something. I'm not going to tell you what it means, but you have to have something that's going to encourage new development in areas that would not conflict with GRSG and nothing you're doing is doing that. That's the bottom line, as I understand what he said. What's wrong with that? It's that the court specifically says in his discussion of vacature that BLM failed to offer, that there were parcels in this lease sale that shouldn't have been offered. So he is imposing a substantive, the district court is imposing. He is because he's reading this provision where it says this objective is intended to lower conflict areas and as such, protect important habitat and reduce time and cost associated with oil and gasoline development by avoiding sensitive areas, that there was some substantive component. And he says, I'm not even going to tell you how to do it. I'm just saying that you have to do something that has a substantive component. Right. And that substantive component was in BLM's discretion to meet. So how did it meet it? The court, pardon me, BLM did impose these stipulations like the one I just walked through. But this specifically says in addition. In addition, it also imposes, basically, there are other issues besides stipulation. There were densities and disturbance caps that you couldn't exceed surface disturbance of a certain density. Basically, BLM was making it more difficult to develop the parcels that had these restrictions on them. So if you had two parcels that had equal opportunity or equal prospect of being able to be developed for oil and gas, and you had one parcel that had stipulations that you couldn't develop for six months out of the year, and also that you'd have to comply with multiple things between those two parcels, a company is going to invest in the parcel that is less that they have to jump through fewer hoops to develop and that costs less to develop. And there's nothing. I'm not sure about this, but here we have this headline on 4ER659, Habitat Protections and Service Disturbance Measures, PHMAs and GHMAs. And the following measures will be applied. And then first is prioritization objectives. Then we have grazing rules. We have let buffers. We have required design features, what seems to me to be what you're talking about. And so these are cumulative. They're not within the prioritization. They're separate. No? Right. All that could be used to meet that same objective, though. There was no indication that those... So in other words, the prioritization objective can be met simply by doing everything else that is in the list and nothing else. Absolutely. And in the... Absolutely. Okay. And so the useless paragraph, it just doesn't mean anything. It doesn't mean anything. These goals are still met. The objective is still met by complying with all of the management decisions before. So you have the grazing rules and elect buffer rules and the required design features. And then you're meeting the prioritization objective. I just wanted to ask, Ms. Moran, whether on behalf of your client, are you only arguing that the lease sells complied with FLPA or are you also arguing that the IAM the 026 IAM was a permissible interpretation? Good question. The court's order seems to imply that the lease sales were invalid because they followed the IAM, but it is Western Energy Alliance's position that both the 2018 IAM as well as the lease sale here were consistent with FLPA. Even though Mr. Halpolin is not really defending the IAM, you are? I think you necessarily have to defend the IAM because it's unclear from the court's order whether he was finding that the lease sale was deficient because it followed the IAM or because it violated FLPA in and of itself. But would you need that though, for example, if you say that it did comply with the 2016 with the prior guidance, if the 2018 didn't really change things enough? Because when I look at the 2016, one of the things it says is the IAM does not prohibit leasing or development even in priority habitat because the plans could allow for leasing and development by applying prioritization, sequencing, stipulations, required design features, and other management measures. It doesn't say you have to do every one of them. Or is that not good enough for you? Your question is whether the 2018 lease sale did comply with the 2016? Yes, the 2018 lease sales, wouldn't they really have complied with the 2016 language that I just read? They did comply with the 2016 language, as you just read. And additionally, the record shows that BLM actually did follow the 2016 prioritization and looked through the expressions of interest using the terms of the 2016. Okay, but that gets us back to the question I raised with your colleague about what does prioritization mean? That is one argument, and I think Judge Berzon was kind of going there, is unless you leave something on the table, how can you say that you're prioritizing? If I prioritize cakes over cookies over ladyfingers, but I eat them all, have I really prioritized them? Exactly, Your Honor. And I think we have to look at this on a longer time frame. These plans came into effect in 2015, and BLM had been working through a backlog of leases that had been offered while these 2015 plans were being put in place. So, the plans specifically do not include this mandatory requirement that you defer a certain number of parcels or a certain percentage of parcels from every lease sale. But over the course of the leasing, if you recall, all of these lands were open for oil and gas leasing. So, prioritization is really a question of not a question of if, but when. So, nothing in the land use plans indicates that prioritization had to be a lease sale by lease sale specific. So, the 2016 plan, you're over your time, but we'll be moving on. It's all very complicated. Thank you, Your Honor. It says that it's not intended to wait for all lands outside GRSG to be leased before allowing leasing within GHMS. But it doesn't say that it's not supposed to wait for some lands outside of GRSG, right? Then it says it is intended to ensure, consider, and I don't really know what this means. It's intended to ensure consideration of the lands outside of GHMAs and PHMAs for leasing and development before. So, it does seem to be some kind of a sequence, considering lands within GHMS, outside of GSMA, within. And thereafter, to ensure consideration of lands within GHMAs for leasing and development for considering any lands within GHMAs in an effort to focus future surface disturbance outside of the most important areas. Now, what nobody is explaining is how that dovetails with this expression of interest scheme. And that's where I get all hung up, because they don't understand that scheme. If this assumes that the BLM is still completely passive in terms of deciding what it's going to offer for sale, and it's not going to offer anything for sale in which there's not an expression of interest, then I don't understand what this before that means. It doesn't say that. It doesn't say consider expression of interest in this order. It says offer for sale in this order. It seems to say that. And I would direct you to, it's 43 CFR 3120.1-1, and that's the regulation that talks about what lands are, quote, available for leasing. But I think there are two issues here. There's an issue of what lands you make available. But there's also, you know, this is to encourage actual leasing. So, somebody has to purchase these leases. So, we, you know, if the government puts in a bunch of lands that are outside leasing that nobody's interested in, there are two things that will happen. Either nobody will lease them, or they'll get leased at the minimum, you know, $2 an acre. And then the government's not, you know, really getting its money's worth for these public lands. But I would direct you. So, you believe that all of that, the prioritization scheme and this paragraph in the 2016 guidance are all sitting on top of the current expression of interest scheme such that the agency is doing nothing proactive to try to offer leases outside of the habitat areas. It's just sitting there. I don't think the land use plan actually speaks to BLM's obligation to offer additional lands for lease. Well, it does say that. Well, it's really mysterious. Anyway, if I could, I realize I'm over my time. If I could make one point with regards to the vacature issue here. The inherent problem, and the court has addressed this, is that it vacates the leasing decision and the subsequently issued lease contracts, which are property and contract interests that are held by the lessees. Does it? Does the order actually say that? It does. And I have that citation. You know, Plaintiffs had argued, yeah. Where is it? Oops, I had that up. It speaks specifically to vacating the lease decisions out here. Actually, the order in this case doesn't seem to vacate anything. It is ordered as follows on page 32 of the order and 38 of the ER. So tell me where that order says any of this. Sure. Um, so I'll look at the order then and I want to, um, the plaintiff's brief. Let's see. So it says, um, vacate the 2018 IM and the lease sales in their entirety, except for the portion of the butte parcel. Well, that's what he says he's going to do, but then he has an order that doesn't do it. Um, and Your Honor, that's actually what we made that distinction in our brief, which is at Wyoming ER 166. Plaintiffs specifically asked in this case for vacature of the leasing decisions and all leases connected with, in connection with those sales. Um, and so we had argued, um, and the court in Conner v. Burford actually addressed this. There was some ambiguity as to whether, um, the lease sales, the leases themselves, those real property and contract interests had actually been vacated by the court's order. And I think because Conner v. Burford, the court there recognized this issue, um, said that we declined to vacate the actual lease sales. Instead, we're vacating the challenge agency action, which was that decision to offer the parcels for lease. And then they remanded. And that's the, um, that's what we advocated should be the remedy here. If the court indeed did find a violation. All right. You're way, way, way over your time. Thank you very much. Thank you very much. It would be somewhat helpful to me to begin where we just ended, which is what did the um, is Mr. Cassidy planning to go or is it, um, my turn as the counsel for the appellees? You're up. Thank you very much. I apologize for the confusion. May it please the court, Michael Freeman appearing on behalf of the appellees. To answer your question, Judge Berzon, the district court vacated the leases as well as the lease sales. Where can I do that? If you look at, um, page, I believe it's, um, page 37 and 38 of, um, volume one of the excerpts of record, the court in vacating the lease sales specifically acknowledged that in doing so BLM would be required to issue. All right. So he said that he will follow the norm procedure and vacate the lease sales, but then it is currently ordered. And then what does the order say? The order says, um, he grants the, I think the remedy state in the remedy ruling that he issued, um, he says the court will follow the normal procedure and vacate the 2018 IM and the lease sales in their entirety, except for certain parcels that were not in sage grass habitat. That's what he says he's going to do. The next page says order. Accordingly, it is ordered. Where in the order did he do this? He, um, he granted our motion for summary judgment with regard to those lease sales. And we specifically requested vacature of those leases. I would note a couple of things. If you look at the order in context that make it clear these leases were vacated. First, in his discussion of the vacater standard under, um, citizens communities, California communities versus toxin. He especially acknowledged that in granting vacater, it would require, uh, make a necessary issue refunds and get refunds from both Wyoming and BLM. That discussion makes no sense if all, if the court's not actually vacating the leases. Second, I think the, the appellants here clearly understood that the leases had been vacated. They responded to this order with a motion for stay pending appeal in which they emphasize that without a stay of that order, they would suffer the harm from having to refund the money. So I think the district court and the appellants here all clearly understood that what the district court was doing was vacating the leases as well as the lease sale decisions here, um, um, turning to the merits of this and the question of what prioritization means the plans here, the district court's ruling should be affirmed. Um, it's important to recall here that the BLM adopted the 2015 plans and their prioritization requirement, um, specifically to protect the sage grouse and avoid the need to list the sage grouse under the endangered species act. It then turned around and reversed itself. It reinterpreted prioritization, um, after avoiding the ESA listing, it reinterpreted prioritization to basically render a dead letter. Um, and that reversal was inconsistent with the 2015 plans. The plans direct BLM to give, you know, in leasing for oil and gas leases, the plans direct BLM to give priority to leasing and development outside of grouse habitat. As a practical matter, in light of the expression of interests, this is what I've been struggling with, system, which you're not directly contesting. Um, what does it mean? Does it mean that they, if they have the expressions of interest, um, if nobody is expressing interest in some property outside the, um, the, um, habitat areas, they nonetheless offers them for sale or they tell people, unless you go come, come up with something. What does it mean? I don't understand what it means. So two points, your honor. I mean, first, the language of the, of the plan says that what prioritization means for BLM, um, to affirmatively guide new leasing and development away from grouse habitat. And importantly, not just away from habitat, but also, um, when it does issue leases to start with, um, lands that are outside the habitat altogether. And then if there's no lands there to look at, quote, the least suitable habitat, and that's at four excerpts of record, page 528, and only then to consider leasing in the top quality habitat, the priority habitat. And so in a situation where, for example, Does that mean that it offers for sale ones outside of the area? Uh, it doesn't, it doesn't wait for these expressions of interest, or it gives some notice that, um, I, that we're only going to, um, approve a half of the expressions of interest of the roles in the property. So you've got to come up with some outside or what does it mean? If, if there, I mean, certainly if there are expressions of interest outside of habitat, that would, those would be what BLM has to focus on. But in a case like this one, where all the expressions of interest were inside habitat, BLM has a couple of different options for how to guide leasing away from the most important habitat. For one example, it could choose to offer parcels in general habitat, which are, which are protected and required to be prioritized, but are less high quality habitat than the really key priority habitat. You could also choose to offer just a smaller number of leases. You know, nothing, um, you know, what BLM here did was to offer everything. Isn't that the key part and help me here. Isn't your view that in order to prioritize, you have to leave some amount on the table. Otherwise quote priority doesn't work. I mean, so far you haven't said that explicitly, but the thrust of the argument seems to be in that regard. And Judge Berzon's questions would seem also to go toward, um, you should offer a whole lot of stuff elsewise so that you can leave the sage grouse on the table. Isn't that what your argument is? On this record? Yes, Your Honor, because the duty under the 2015 plans is to guide leasing away from habitat and especially from the most important habitat. But if, but if, if there's no oil on any other habitats and maybe that's right, maybe that's not, but simply calling it prioritization doesn't do the job unless the meaning of prioritization is you have to leave some of it on the table. Frankly, I thought, think the idea was that there'll always be too much interest. So let's start with the stuff that is less, um, uh, less important either outside or general and only work our way down. Now, did that simply turn out not to be right? Or is BLM cheating and not offering? There's lots of good oil outside of the habitat and they're just cheating and not offering it. No, the key flaw here, Your Honor, is that, um, what BLM didn't do with the 2018 IM and with Wyoming lease sale was to give any substantive meaning to what prioritization requires. There's no effort to guide leasing and away from grouse habitat or away from the priority habitat, whether by leaving it. You agree that, or do you, that there is good oil land outside of this area that they should have offered? If there is, then saying they violate prioritization makes sense. If there isn't, your argument boils down to prioritization means leaving the better stuff on the table and not doing it. On this record, Your Honor, prioritization means leaving the most important parcels on the table as part of, but how many, you know, 10%, 40%, 50%. Is there anything in any of the record or the guidance or anything that would inform that? Because clearly you might only lease 10% and leave 90% on the table. There is absolutely, Your Honor, just by way of example, the record indicates that over 40 of these leases, over 25% of the total were priority habitat that had active sage grouse on them. These are the breeding areas that are the most important habitat. Yeah, but the 2016 IM, which we've been arguing about, flatly says it doesn't prohibit leasing even in PHMA because you can do some other things. Because if prioritization means you can't do it, then that sentence makes no sense. It says it doesn't prohibit leasing or development in PHMA. It's got to mean something else, doesn't it? Your Honor, it doesn't, the prioritization requirement is not a blanket flat prohibition on leasing grouse habitat. That, what the plans really did was adopt a compromise here where BLM considered just closing grouse habitat to new oil and gas leasing altogether. Instead, it adopted the prioritization requirement, which in essence directs BLM to put a heavy thumb on the scale against leasing in grouse habitat and especially against leasing in the most important habitat. What BLM has done here is really treat that prioritization provision as a nullity, as meaning nothing at all separate from the other provisions like stipulations and mitigation measures. I think the key point here and the key flaw that BLM made was that it failed to recognize the different roles that stipulations and mitigation measures under the plan play compared to prioritization. Okay, but then we really, counsel, we really agree that in this interpretation, prioritization has got to mean leaving some of it undeveloped, no matter what else you do. I mean, you've said that, I think maybe I'm beating the dead horse, but you say on this record and this record is where the expressions of interest are all in some type of grouse habitat. Is that fair? On this record, on these facts, yes, that's the case, your honor. Then on any other record, again, if I were in your position and trying to make more sense of it, I would say, here's some other good land that's outside of habitat. Why didn't you do that? Either it's a political reason or a monetary reason or something, but I don't see any of that. Do you think there's oil and gas anyplace else that they could lease? There certainly is, your honor. And for example, in the Montana sale, many of the parcels were in grouse habitat. Other parcels were outside of grouse habitat. But the problem here is that... They refused to lease the ones outside the habitat? They leased all of it. Okay. The problem here is that BLM never went through that exercise. There's no explanation here of how it decided to prioritize or, and certainly didn't consider offering... But wait a minute. There's the 2018 IM that you're challenging, and it does tell you. It says, unless there's a backlog, we're not doing it. Right. And that's what I mean, your honor, is that in this case, the BLM just decided, we don't consider leaving leases on the table because there's no backlog. The government says it's not challenging the vacature of that instruction. Where does that leave the role of that instruction in this case? Well, your honor, Wyoming and Western Energy Alliance are challenging the IM. So I think that the IM and the district court's decision vacating it are still before the court. Right. You presumably heard the arguments in the other case into a little bit in this case about A, the question of whether we have an injunction here and B, the remedy. Is there anything, I want to ask a very specific question. Is there anything about this case that would suggest that the outcome on either of those issues should be different than in the other case? Yes, your honor. Let me start with the injunction vacature issue. There was no argument in, there's no argument in this appeal that the decision vacating the 2018 IM was an injunction. The premise of the appeal brought by all the appellants was that the vacature of the leases was somehow an injunction. And that's wrong for the reasons that have been discussed already. That's wrong. The appellants haven't been able to cite a single case holding that a court decision vacating agency action is somehow an injunction. That's just inconsistent with Alcea Valley Alliance and another case law. So you're saying it's not different, it's the same? Uh, there's no injunction here, your honor. Right, exactly. Because in both instances, irrelevant, the important question is the leases. And you're saying they're both the same, not different. Right. Can I ask on that? Does it matter if it was that the judge vacated the leases or the sale of the leases? Does that make a difference in whether injunction? Your honor, in this case, the court vacated both the leases and the sale of the leases. It doesn't matter for purposes of an injunction because all the court did was to vacate the decision and the leases. And the questions about whether BLM as a practical matter needs to issue a refund or take other steps are sort of the practical implications of those. But they're not mandated. The court didn't order BLM to do anything. But I think you heard from the Wyoming representative in the other hearing that the consequences here are serious, you know, in terms of the economics. Does that not inform us on whether or not this is an injunction? Your honor, you know, one of the factors under the 1292A1 is whether there are serious consequences. But whether or not that's met, the other two prongs here are not met because it does not have the practical effect of injunction. By way of example, you know, under the statute that they were citing, 30 U.S.C. 1721A, the obligation for a refund is only triggered if the lessee asked for a refund. And so nothing would stop the lessees in Wyoming and BLM from agreeing to just stand down, not and defer any request for a refund until a later stage. Were they to do that, no one would be subject to any risk of contempt of court here because all the court did was to vacate the leases itself. It didn't require any of the ministerial follow-on steps that are the practical result of that. Um, and I know that isn't practical effect when you just said that they're ministerial and they're practical effect. Isn't that one of the standards for whether it's an injunction or not? No, your honor. The standards for injunction are number one, whether the court, uh, whether it's injunction is whether it's subject to contempt and whether the order is directed to a party. And here the court's order was not directed to any party. It simply vacated the leases itself. The other, the other reason why they haven't met the injunction standard for the injunction exception for appeal here is that the third prong is a requirement that, um, that it not be, it not be, this not be the only way of getting effective review of the court's decision. And, um, here, if, um, the parties can wait until after final judgment, and if they were to appeal this partial summary judgment after final judgment, and it's reversed, those leases would spring back to life. Um, when, when, when is final judgment likely here? Your honor, um, the second phase of the case is, um, due to be argued on summary judgment, um, early next month. Um, and it may be sometime late in the summer. It might be next year because there may be a, there may be some follow-on proceedings in the case as well, but it's, um, in the neighborhood of... I still don't understand why nobody asked for a certification. Your honor, we're in the same boat as in the other case. We're unclear why they didn't go that route. The, the appellants all agreed to do that in the schedule order and then refused to do it. Um, but you know, we recognize that all the parties here, um, contemplated that there would be some value to getting interlocutory review of at least some of the common issues raised by phase one. And so as, uh, Mr. Luke has pointed out, you know, the Kirsch exception might be one option here where the court could give the parties a deadline to go get a 54B certification, which has the potential anyway to, to cure the jurisdictional problem. Um, if I could turn, um, also to the remedy question here, um, I think the, this case, it does stand, um, on very solid grounds with regard to remedy here. The district court just did not abuse its discretion in, in vacating the leases as part of a remedy. It applied the correct legal standard under California communities, communities versus toxics. It didn't make any factual errors and it just wasn't irrational for the court to award the default APA remedy here. First, the, the flip of the violation here was serious because prioritization goes to the heart of BLM's leasing decision, which is the question of which leases to offer and which leases not to offer. And it was entirely appropriate for the district court to give BLM a clean slate on remand so that it could, it could apply prioritization accurately. And, um, so I know I seem to have broken the record on this, but so implicitly you have to be challenging the expression of interest method and saying that you can't, that the agency could not simply rule on expressions of, of interest that came before it, but had in some way to make a decision about what to offer first hand. So your honor, so I want to go, I just try to answer your question. I want to go back to the plain language of the plans and what they direct BLM to do. And here, uh, the plans say guide new leasing and development away from grouse habitat, and especially the most important grouse habitat. And what BLM had done before, when it initially adopted the 2015 plans was to guide, guide leasing away from the habitat by deferring leases that were, where there were expressions of interest, um, where those, which is essentially saying we're not going to issue leases within some of the leases within this area, go find some outside. Or, or we're only going to offer some leases in the less important habitat. Because counsel the, at that same 2016 IM in the next couple of pages, the headings is factors to consider while evaluating EOIs. And then it talks about pending EOIs and less than say leases sold, but not issued. It doesn't talk about anything about prioritizing lands for which there is no EOI, do they? Yeah, as a practical matter, BLM's approach to this was to start with what, uh, EOIs are issued. That is, it, um, it has the authority to offer leases for which no EOIs have been issued, but they're, they're, as a practical matter, they consider lands for which an EOI was, was offered. Right. And the priority then it talks about if you've already got an oil well, go, go to the one that's next closest to it. And then, you know, there are these factors, there are like eight or nine of them, and that is a prioritization. It's just, you want them to stop before they get to the bottom of the inbox. No, your honor. Well, what we're saying is that, um, in, in considering those factors or other factors, BLM has obligation was to make its leasing decision with regard to EOIs or, or any other lands with an, with the aim of guiding that leasing away from habitat or the most important habitat. And, um, the analysis that they, they, they did under the 2016 IAM was to look at factors like, is it outside the habitat? Is it general habitat? And then within each category, they looked at things like whether it's got a lack on the, on the land, whether, um. I'm reading the factors. You're good on that. Right. And none of that analysis was done here. And that's, that's really the critical flaw is that in the 2016 IAM. If there are no EOIs outside the area, how does any of this apply? If they don't have any? I'm sorry, your honor. If there are no EOIs on a particular, for a particular sale outside the area, the, the habitat area, then what are they, they're supposed to consider all of this while evaluating EOIs in each category. And they're saying which is more appropriate than what, but if all the ones they have are inside, then you say, well, the ones on, on the, um, priority, on the priority area have less priorities than the ones in the general area. Okay. But they have both and they can grant both. So what's the priority? I don't, I still don't get it. So the priority, your honor, is if you think about the purpose of these plans, which was to conserve grouse habitat. Well, I understand that, but you have a bunch of these EOIs. You can grant all of them. You're saying, but they should not grant some of them. I mean, it doesn't sound like a priority decision. It sounds like, um, a decision about, um, whether you're going to sell these things or not, whether you're going to sell them more than you're going to sell all the ones. That's right. I think that's right, your honor. Again, the, the only way on this record that has been identified for how to guide leasing away from grouse habitat is to choose not to lease some of, some of those lands. Okay. So, so if, if they had had, if they did everything that you wanted in prioritization, which sounds like a process, not a decision, and they ranked them from one to 30 with the, all the experts and all the birds and so on, and then they started down, where's the rule that says stop at number 15 or stop at number 20. If, if there's a time constraint or a resource constraint, it makes perfect sense, right? We will, we, we want to take the 10 most benign, but then we keep going. And what is it that tells us, or even guides, where do you stop? Okay. It makes perfect sense with a backlog. I understand perfectly, but if they can keep going, what tells them to stop? Your honor, the exact cutoff point or the, you know, the actual point there depends on the specific land. The answer to the question has to be, and you haven't given it and no one else has given that, but it seems to me there's always next year. In other words, that you don't have to do this within a one year timeframe of things that are sitting in your desk at the time. But, you know, there's nothing exactly in here that says that, but that has to be your premise. There's always next year. That's right, your honor. That's what BLM did was to say, we're going to defer these leases until, and that's why they're called deferrals. There's always next year. And they withheld them from given sales, recognizing that they might be available later. But what they didn't do under the 2018 IM was to even consider that analysis. They just said prioritization means nothing at the leasing stage, and we can lease everything that's been proposed. And that just isn't faithful to the language or the well-documented purpose of the plans. That, you know, what BLM had to do here was guide, you know, make its leasing decisions with the aim of guiding leasing away from the most important habitat. And where it does decide to issue a lease in priority habitat or general habitat, it has to offer a reasoned explanation for how that decision actually comports with the goal of preserving habitat and protecting the grouse. And it's that analysis that's completely missing here, because under the 2018 IM and this Wyoming sale, BLM simply treated prioritization as imposing no limits. So let me ask one last question. You're way over your time, too. At least it's my last question. My colleagues have other questions. To go back to what I asked before, with regard to the other case, it would seem to be a viable and perhaps more sensible remedy to suspend the action of the lease and redo the participation. Is something like that available here? Or is this different because you say it's not procedural and substantive, so you really can't do something like that? This is very different because it was a substantive decision. There's a substantive requirement that has a very central impact on the substance of the decision. Again, the standard for reviewing the remedy is abuse of discretion. And it's clear on this record that the district court's remedy was not an abuse of discretion. And the key fact here is that... Even if we thought it was in the other case. That's what I'm asking you. Yes. Yes. I think the FLIPMA violation here is simply a different violation than the other case. And regardless of what you say in the other case, here BLM's error went to the heart of its leasing decision. Moreover... Okay. You're out of time. Very much so. So thank you very, very much for a helpful argument. Mr. Hallinane and Mr. McMurray, which one of you is going to give a rebuttal? We'll give you a minute to rebut. I'll give you a rebuttal, Your Honor. So thank you, Your Honor. Just to follow up on just a couple of things. If the court wants to see how BLM understood prioritization in this case, in the third volume of the federal government's excerpts at 322-23, the government explains in response to a protest from plaintiffs how it's going about prioritizing here. But I also wanted to say... Well, we know how it did because it had the IM and it said that it was only going to do it if there was a backlog. So we know that it wasn't doing it. It said so. So in this response, the government talks about how it's doing things beyond what's in the 2018 IM and it talks about the 2016 IM, which again, I think everybody seems to agree that complying with the 2016 IM would not necessarily be problematic in terms of implementing... You're saying they didn't follow the 2018 IM. So the 2018 IM is discussed there and the 2018 IM basically says, you know, if there's backlog, then you have to prioritize. But I don't think it sort of substantively limits BLM's ability to use other tools, which I think is what it did here. And just to comment on the remedy briefly, to the extent the court is thinking that the court would be to send it back to BLM rather than having the court try to figure out exactly how to implement this for the Bureau, just to remand it back to BLM. And I think, you know, this meets the standards for remand without vacater and that would be the most appropriate. The vacater is a different question, but the notion that we're going to set these standards, the district court certainly did them and I don't know how we would do that. Okay. Thank you very much. Thank you, Your Honor. Thank all of you for bearing with us and for trying to eliminate these complicated cases. The case of Montana Wildlife Federation versus Bernhardt is submitted and we are in recess. Thank you very much.
judges: Boggs, Berzon, Murguia